UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Choice Hotels International, Inc.** | ) | **CASE NO. 1:25 CV 2093** |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| **vs.** | ) | |
| **Mansfield Hotel, LLC, et al.,** | ) | **Memorandum of Opinion and Order** |
| **Defendants.** | ) | |

**INTRODUCTION**

This matter is before the Court upon plaintiff Choice Hotel International Inc.'s ("Choice") Motion for Summary Judgment (Doc. 21). This is a trademark infringement case. For the foregoing reasons, the Motion is granted in part and denied in part.

**BACKGROUND**

Choice brought this action against defendants Mansfield Hotel, LLC ("Mansfield"), Gita Jasani ("Jasani"), and Satish Patel a.k.a. Sam Saspra ("Patel") (collectively, the "Defendants") for alleged trademark infringement following Mansfield's termination of its franchise agreement with Choice. Choice and Mansfield entered into the franchise agreement on May 20, 2014 ("Franchise Agreement"). (Doc. 1-1). Pursuant to the Franchise Agreement, Mansfield was permitted to operate a Quality Inn & Suites® at 500 N. Trimble Road in Mansfield, Ohio and use Quality's "Brand and Choice Marks" (as defined in the Franchise Agreement). (*Id.*).

On September 21, 2023, Mansfield sent an Election to Terminate the Franchise Agreement as a matter of right pursuant to Section 3 of the Franchise Agreement. (*See* Doc. 1-4). The termination

was to be effective as of May 20, 2024. (*See id.*; *see also* Doc. 21-3). On November 7, 2023, Choice accepted Mansfield's termination conditioned, in part, upon Mansfield discontinuing the "use of Choice's proprietary marks … [by] May 20, 2024." (*Id.*).

After terminating the Franchise Agreement, Mansfield began operating as an independent hotel, under the name Mansfield Hotel. (Doc. 21-3; Doc. 24-1, ¶ 11). Mansfield contends that it "removed all Quality Inn Marks from throughout the hotel, that otherwise identified the hotel as a Quality Inn franchise[.]" (Doc. 24-1, ¶ 6). But Mansfield apparently could not afford to remove a large high-rise sign bearing a Quality Mark (the "Highway Sign"). (*Id.* at ¶¶ 6–7).

On June 11, 2024, Choice issued a Final Notice of Termination demanding, among other things, that Mansfield "[r]emove (or adequately cover until removed) at [Mansfield's] expense all signs and other displays or usage of Choice's trademarks[.]" (Doc. 1-5). Apparently, Mansfield was unable to remain financially viable as an independent hotel. It defaulted on several mortgage obligations and failed to pay its property taxes. (Doc. 24-1, ¶¶ 11, 12). Mansfield claims the hotel closed for business in November 2024. (*Id.* at ¶ 11).[1] The hotel has since been condemned by the City of Mansfield. (*Id.*).

Despite the alleged closing, the Highway Sign remained standing. (*See* Doc. 21-3). On January 24, 2025, Choice sent Mansfield another letter (with pictures of the alleged trademark

---

[1] In its Motion, Choice alleges that there was an FBI raid at the hotel in September 2025, notwithstanding the alleged closing. That same month, Choice alleges that an individual called a neighboring Quality Inn location mistakenly believing he was assaulted at the neighboring location. It turns out the incident occurred at the Mansfield Hotel location. (*See* Doc. 21). It is unclear from the briefing and evidence whether the Mansfield Hotel was operating as a hotel at the time of the alleged raid and assault. Choice does not cite any record evidence in support of these allegations but simply cites various paragraphs in the complaint. The Court cannot rely on bare allegations in the complaint when deciding a motion for summary judgment. *See* Fed. Rule Civ. P 56(c)(1).

violations) demanding that Mansfield immediately cease use of all Choice owned marks, including removing the Highway Sign and discontinuing use of the Choice marks on Mansfield's TripAdvisor listing. (*Id.*). Shortly thereafter, Mansfield responded to Choice stating that the hotel was scheduled for demolition at the end of the month, but Mansfield agreed to prioritize removal of the Highway Sign. (Doc. 1-7). Mansfield claimed it was unaware of the TripAdvisor listing but pledged to "promptly take the necessary steps to have it removed." (*Id.*).

Choice filed the present lawsuit on October 1, 2025. It is unclear whether the Mansfield Hotel was ever demolished, but the Highway Sign remained standing until a month after this lawsuit was filed. Manfield painted over the Highway Sign on November 5, 2025. (Doc. 24-1, ¶ 9). Choice now moves for summary judgment on all its claims against Mansfield, Jasani, and Patel seeking various forms of monetary damages, a permanent injunction, and attorneys' fees. Defendants oppose the motion.

## **STANDARD OF REVIEW**

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact[.]" Fed. R. Civ. P. 56(a); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine dispute of material fact rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242,

248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [moving party]." *Id.* at 252.

The evidence, facts, and all inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party has put forth sufficient evidence to meet its initial burden, the nonmoving party must present probative evidence sufficient to defeat summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In other words, the nonmoving party must present affirmative evidence to support its position; a mere "scintilla of evidence" is not enough. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003). If there is a genuine dispute of material fact as to an essential element of the moving party's claim, the motion must be denied.

## ANALYSIS

Choice brings four claims against the Defendants: (1) infringement of a federally registered trademark pursuant to 15 U.S.C. § 1114; (2) false designation of origin pursuant to 15 U.S.C § 1125(a); (3) violation of Ohio's deceptive trade practices act; and (4) trademark infringement/unfair competition under Ohio law. Choice seeks a permanent injunction and monetary relief in the form of (1) disgorgement of Mansfield's profits; (2) its actual damages expressed as a reasonable royalty; (3) the costs of maintaining this action; (4) treble damages; and (5) attorneys' fees by designating this as an "exceptional case." The Court will address each of these in turn.

### A. Injunctive Relief

Starting with Choice's request for an injunction, Choice seeks "[a] permanent injunction prohibiting Defendants from making any further use of the QUALITY® family of marks." (Doc. 21,

p. 24). On February 12, 2026, the parties filed a Consent Motion for Preliminary Injunction and a proposed Agreed Order Granting Preliminary Injunction, enjoining the named defendants from, among other things, "using any of the marks in the QUALITY® Family of Marks…." (Docs. 18, 18-1). The Court granted the motion and issued a preliminary injunction on February 17, 2026. (*See* Doc. 19). Choice now seeks to make the injunction permanent. (*See* Doc. 21, p. 24). Defendants note that Mansfield has "removed all Choice / Quality Inn Marks from the subject closed hotel property" and, therefore, Defendants "agree to a permanent injunction relating to the subject hotel property." (Doc. 24, p. 13). Thus, Choice's request for a permanent injunction is GRANTED against all Defendants. The parties are to file a proposed permanent injunction within 30 days of the issuance of this Order.

**B. The Individual Defendants' Liability**

Before reaching the merits of Choice's claims, the Court must first determine whether a legally cognizable basis exists (at the summary judgment stage) for imposing liability on the individually named defendants. In addition to its claims against Mansfield, Choice has sued two of Mansfield's members—Jasani and Patel (together, the "Individual Defendants")—requesting that all defendants be held jointly and severally liable under the Lanham Act "for Federal Trademark Infringement and Federal Unfair Competition[.]" (Doc. 1, at 19).

It is true that, "[c]orporate officers may be held personally liable for Lanham Act violations." *Simmons v. Cook*, 701 F. Supp. 2d 965, 989 (S.D. Ohio 2010) (citing *State Farm Mut. Auto Ins. Co. v. Sharon Woods Collision Ctr., Inc.*, 2007 WL 4207158, at *1 (S.D. Ohio Nov. 26, 2007)). This personal liability comes in two flavors: when a corporate officer "personally take[s] part in the infringing activity or direct others to do so[,]" and when the corporate officer is the sole shareholder,

officer, and director of the company infringer. *Id.* Courts in this Circuit have described officer liability as follows:

> [T]he general rule is that an officer of a corporation may be personally liable for the corporation's infringement without piercing the corporate veil. An officer must do more than merely control corporate affairs. The officer must personally take part in the infringing activity or direct others to do so in order to be liable. In such a case, the officer is liable as an actor, not merely as an agent or owner of the corporation.

*GS Holistic, LLC v. Express Smoketown, Inc.*, 2024 WL 3228392, at *3 (N.D. Ohio June 28, 2024) (quoting *Top Tobacco, L.P. v. Abdelshahed*, 439 F. Supp. 3d 992, 1006 (M.D. Tenn. 2020), *vacated in part on other grounds by* 2020 WL 5366523 (M.D. Tenn. Sept. 8, 2020)). While Manfield is a limited liability company, LLCs are analyzed under the same principles as corporations when determining individual liability. *N. A. Bus. Ass'n, LLC v. United Merch. Servs. Club, LLC*, 2024 WL 1258626, at *4 (S.D. Ohio Mar. 25, 2024).

As for Choice's state-law claims, trademark claims under Ohio common law follow the same analytical rubric as the Lanham Act. *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003). Similarly, an individual may be held liable under the Ohio Deceptive Trade Practices Act if the individual "'personally committed [the wrongful] acts.'" *Mulch Mfg., Inc. v. Advanced Polymer Sols., LLC*, 947 F. Supp. 2d 841, 867 (S.D. Ohio 2013) (quoting *Roberts v. RMB Ents., Inc.*, 967 N.E.2d 1263 (Ohio Ct. App. 2011)). The issue, then, is whether the Individual Defendants actively participated in the infringing activities or directed someone else to do so.[2] Choice has presented no such evidence.

---

[2] The record contains no evidence that either Jasani or Patel was a sole shareholder, officer, or director of Mansfield. In fact, the evidence suggests that Mansfield is a multimember LLC. (*See* Doc. 1-2).

First, there is no evidence in the record that either Jasani or Patel were officers, or even employees, of Mansfield. One of Mansfield's former members, Jit Maniya, operated the hotel "from the date of purchase through approximately August 2023, when he passed away." (Doc. 24-1, ¶ 4). There is no record evidence to suggest who operated the hotel after May 20, 2024, when the Franchise Agreement was terminated and when the alleged infringement took place. There is also no evidence to suggest that the Individual Defendants took part in the infringing activity or directed anyone to do so. And there is no evidence that the Individual Defendants had the "right and ability to supervise" Mansfield's infringing activities. *See ACT, Inc. v. Worldwide Interactive Network*, 2020 WL 12574301, at *8 (E.D. Tenn. July 9, 2020). In its Reply, Choice claims that "Jasani's own affidavit describes her personal direction of the de-identification effort—deciding which marks to remove, when, and at what cost…."[3] (Doc. 26, at 4). But that is not what the affidavit says. Jasani avers that *Mansfield* did not have sufficient funds to remove the Highway Sign (Doc. 24-1 ¶ 7), *Mansfield* removed all CHOICE® marks other than the Highway Sign (*Id.* ¶ 10), and *Mansfield* ultimately painted over the sign (*Id.* ¶ 9). Nowhere does Jasani state that she personally made or participated in

---

[3] The Court declines Choice's invitation to disregard Jasani's declaration entirely as "self-serving." (*See* Doc. 26, at 6). Choice is correct that numerous courts have held that self-serving affidavits can be insufficient to create a genuine issue of fact to defeat summary judgment. *See Reich v. City of Elizabethtown*, 2018 WL 6028719, at *5 (W.D. Ky., Nov. 16, 2015) (citing cases). But that is generally when an affiant contradicts prior testimony or discloses facts that were not previously disclosed in discovery. *See id.* Here, Jasani's declaration does not contradict prior testimony. She was not deposed. To the extent her declaration interjects facts that were not disclosed in discovery, that is because virtually no discovery was conducted. What is more, the Sixth Circuit has stated that "sworn affidavit[s], standing alone, may create a genuine dispute of material fact that forecloses summary judgment … even if the record lacks corroborating evidence." *Lamb v. Kendrick*, 52 F.4th 286, 296 (6th Cir. 2022). Where, like here, "the evidence consists of one party's affidavit against another's, there is no procedure that allows federal courts to disregard [one party's] testimony simply because it is self-serving." *Id.*

those decisions. The fact that Jasani was aware of the actions Mansfield took does not establish that she actively participated in those decisions. And Choice has put forth no evidence at all related to Patel's role with Mansfield.

Choice devotes a significant portion of its brief arguing that it lacks evidentiary support for its claims against the Individual Defendants because "Defendants never responded to Choice['s] … written discovery requests[.]" (Doc. 26, at 6; *see also* Doc. 21, at 12). But on its Motion for Summary Judgment, Choice bears the burden of establishing the absence of a genuine issue of material fact from the record evidence. If Defendants failed to participate in discovery, Choice could have employed a number of procedural mechanisms to remedy any unresponsiveness. *See, e.g.*, LR 37.1. But Choice chose not to do anything. It cannot cry foul and ask this Court to award summary judgment anyway.

Choice also claims that Defendants purported to respond to requests for admission ("RFAs")—after the deadline to do so had passed—but the responses were blank and Defendants never supplemented them. Choice contends that the RFAs are deemed admitted under Federal Rule of Civil Procedure 36(a)(3). Confusingly, Choice has not filed the RFAs or even explained what the Defendants are alleged to have admitted therein. Speculative RFA "admissions" cannot satisfy the evidentiary burden necessary to warrant summary judgment. *See Totman v. Louisville Jefferson Cty. Metro Gov't*, 391 F. App'x 454, 464 (6th Cir. 2010) ("[S]peculation is not admissible evidence.").

The only *evidence* before the Court related to the Individual Defendants is that they are members of Mansfield and they signed a personal guarantee. That is not enough to hold the Individual Defendants liable for Mansfield's conduct. Under Ohio law, members of an LLC cannot be held personally liable for any "debt, obligation, or liability" of the LLC solely by reason of being a

member. OHIO REV. CODE ANN. § 1706.26; *Kistner v. Law Offices of Michael P. Margelefsky, LLC*, 518 F.3d 433, 436 (6th Cir. 2008) ("Ohio law precludes personal liability for members of an LLC on the basis of the LLC's liability."). Even if the Individual Defendants breached an obligation under the personal guarantee, which Choice does not allege, Choice did not assert a breach of contract claim against any of the Defendants. Choice has simply failed to meet its burden to establish that the Individual Defendants actively participated in, or directed another to engage in, the infringing activity. Choice's Motion as to Jasani and Patel is DENIED.

### C. Mansfield's Liability

#### 1. Federal Trademark Infringement

Turning to Choice's claims against Mansfield, its first cause of action alleges federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114. That section "prohibits the unauthorized use of a registered trademark" in the sale or advertisement of goods when "using the trademark is likely to confuse or deceive customers." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1188 (6th Cir. 1997). To recover on a trademark infringement claim, the plaintiff must show: "(1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'" *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (quoting *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007)).

Choice has shown that it owns the marks in question. Proof that a mark was registered with the United States Patent and Trademark Office is *prima facie* evidence that the registrant has an exclusive right to use the mark in commerce. *Matal v. Tam*, 582 U.S. 218, 226 (2017). Choice has produced uncontested evidence that the marks at issue were properly registered. (*See* Doc. 21-1).

Further, Mansfield acknowledges that Choice owns and has continually used the marks. (Doc. 24, at 1) ("Defendants do not question … Choice's ownership or right to control the use of its trademarks or service marks."). Thus, there is no issue of material fact regarding Choice's ownership of the relevant marks.

There is also no genuine dispute that Mansfield used a Choice mark, for at least a time, without consent. The parties agree that Mansfield terminated the Franchise Agreement as of May 20, 2024, and Mansfield implicitly acknowledges that it was no longer allowed to use the QUALITY® Family of Marks after that date. (*See* Doc. 24, at 5) ("Upon termination, Mansfield … removed all Quality Inn Marks from throughout the hotel, that otherwise identified the hotel as a Quality Inn franchise, except for the [Highway Sign]."). It also admits that it did not remove the Highway Sign (bearing Quality's trademark) until November 2025 because it "did not have sufficient funds to pay for the removal…." (Doc. 24-1 ¶ 7). Mansfield also continued to operate as a hotel, for some period, following termination of the Franchise Agreement. Thus, there is no genuine issue of material fact that Mansfield used Quality's trademark without consent.

Mansfield does not specifically address the issue of marketplace confusion. It simply argues that "[t]he removal … of all the material containing Quality Inn Marks from all rooms, lobby, breakfast area, [and] parking lot are otherwise counterproductive acts if Defendants in-fact intended to intentionally deceive the public into believing the subject property was a Quality Inn franchised hotel." (*Id.* at 9). But in the Sixth Circuit "proof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'" *Choice Hotels Int'l Inc. v. Jagaji. Inc.*, 2012 WL 3929823, at *5 (S.D. Ohio Sept. 10, 2012) (quoting *U.S. Structures, Inc.*, 130 F.3d at 1190); *see also Red Roof Franchising,*

*LLC v. Riverside Macon Grp.* 2020 WL 2494462, at *8 (S.D. Ohio May 14, 20200 ("While the Court usually cycles through an eight-factor test to determine whether a 'likelihood of confusion' exists, that is unnecessary where the allegation of infringement involves a hold-over franchise."). There is no dispute that Mansfield—a former franchisee—continued to use Quality's mark on the Highway Sign after the Franchise Agreement was terminated. So, under Sixth Circuit precedent, there can be no issue of material fact as to whether Manfield's unauthorized use was likely to cause confusion. *See U.S. Structures*, 130 F.3d at 1189.

Far all the aforementioned reasons, Choice has established that it is entitled to judgment against Mansfield for violating Section 32 of the Lanham Act.

**2. Choice's Unfair Competition and Deceptive Practices Claims**

Courts in the Sixth Circuit have held that "'the same analysis applies' when determining liability on a 'plaintiff's [federal] trademark infringement, [federal] unfair competition, and Ohio law claims' for common law trademark infringement, unfair competition, and deceptive trade practices." *Jagaji*, 2012 WL 3929823 at *6 (citing cases). Because Mansfield is liable for federal trademark infringement, it is also liable for Choice's claims for federal unfair competition (15 U.S.C. § 1125(a)), violation of the Ohio Deceptive Trade Practices Act (Ohio Rev. Code § 4165.01-04 *et seq.*), and Ohio common law trademark infringement and unfair competition. Thus, Choice has met its burden to establish Mansfield's liability on its remaining claims.

For all the aforementioned reasons, the Motion for Summary Judgment is GRANTED as to Mansfield's liability.

**D. Damages**

**1. Lanham Act Damages – Mansfield's Profits**

A plaintiff in a Lanham Act case is entitled to recover "(1) defendant's profits, (2) any damages sustained by plaintiff, and (3) the costs of the action[,]" subject to the principles of equity. 15 U.S.C. 1117(a). When evaluating whether profit disgorgement is equitable, courts in the Sixth Circuit consider a wide range of factors, such as:

> the defendant's intent to deceive, whether sales were diverted, the adequacy of other remedies, any unreasonable delay by the plaintiff in asserting its rights, the public interest in making the misconduct unprofitable, and "paling off," i.e. whether the defendant used its infringement of the plaintiff's mark to sell its own products to the public through misrepresentation.

*La Bamba Licensing, LLC v. La Bamba Authentic Mexican Cuisine, Inc.*, 57 F.4th 607, 610 (6th Cir. 2023) (quoting *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 343 (6th Cir. 2010)). These *La Quinta* factors should not be applied with mathematical precision; instead, the Court must focus on an equitable balance of these non-exhaustive factors. *Id.* at 610–11. While equity may favor an award of profits without a showing of willful infringement, the infringer's mental state is a "highly important consideration" in determining whether to award profits. *Id.* at 610.

Choice does not address any of these factors. Instead, Choice simply assumes it is entitled to Mansfield's profits and focuses solely on "mak[ing] a reasonable estimate of Mansfield's profits…." (Doc. 21, at 20). But profit damages are not automatically awarded for a Lanham Act violation. *Maker's Mark Distillery Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 700 (W.D. Ky 2010) ("Monetary damages are not automatically recoverable, even where a plaintiff succeeds in proving infringement."); *see also Choice Hotel Int'l, Inc. v. Goldman Hosp., LLC*, 2014 WL 642731, at *13 (N.D. Tex. Feb. 19, 2014) ("An award of defendant's profits is not automatic." (internal quotation

marks and citation omitted)). When considering the *La Quinta* factors, a genuine dispute of material facts precludes summary judgment on Choice's request for profits.

Starting with Mansfield's intent to deceive, it is undisputed that on November 7, 2023, Choice notified Mansfield that its continued use of Choice marks after May 20, 2024, would "constitute trademark infringement…." (Doc. 1-4). Seven months later, Choice sent Mansfield another letter demanding that Mansfield "[c]ease and desist representing and identifying the … hotel as a Quality Inn & Suites® hotel[.]" (Doc. 1-5). Choice even gave Manfield the option to "adequately cover" the Highway Sign until it could be removed. (*Id.*). Mansfield apparently failed to take this lesser option. On January 24, 2025, Choice sent Mansfield another letter demanding that Mansfield stop using Choice's marks and even included a picture of the infringing Highway Sign. (*See* Doc. 1-6). Mansfield acknowledged its continued use of the Highway Sign during this period but failed to take any action to remedy the infringement. The Highway Sign remained on display at the hotel for a year-and-a-half after the Franchise Agreement was terminated. Mansfield's intent to deceive can be inferred from its continued use of Choice's mark after receiving numerous notice and cease-and desist letters. *See Wynn Oil Co. v. Am. Way Servs. Corp.*, 943 F.2d 595, 603 (6th Cir. 1991) ("[C]ourts have held that use of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement.").

But there is also evidence that would cut against a finding of intent to deceive. Mansfield claims it removed all of Quality's marks from the hotel except the Highway Sign. The only reason the Highway Sign was not removed was because it did not have the $10,000 needed for removal. (Doc. 24-1 ¶ 7). While its effectiveness is questionable, Mansfield made sure to "never illuminate" the Highway Sign in an attempt to minimize passersby's ability to view the sign. (*Id.* ¶ 8). Mansfield

also stopped accepting online reservations and attempted to remove all Choice branding from its online presence. (*Id.* ¶ 10). When Choice notified Mansfield that its TripAdvisor listing still bore Choice's marks, Mansfield responded that it was "unaware of the listing on TripAdvisor" and would "promptly take the necessary steps to have it removed." (Doc. 1-7). These remedial actions are inconsistent with an intend to deceive. Indeed, courts have found that an infringer lacked intent to deceive where it "undertook extensive efforts to remove" a plaintiff's branding. *See Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 544 (S.D. Tex. 2013). Viewing the evidence and inferences in the light most favorable to Mansfield, as the Court must, Choice has failed to demonstrate as a matter of law that Mansfield intended to deceive the public by failing to remove the Highway Sign.

The second factor (diverted sales) and sixth factor (palming off) are related and therefore warrant joint consideration. Whether sales were diverted is straightforward; and Choice has presented no evidence that sales were diverted as a result of Mansfield's continued use of the Highway Sign. Choice has failed to meet its burden with regard to diverted sales. Palming off also involves diverted sales but requires more. It involves the infringer's deliberate attempt to pass off its goods or services as those of the plaintiff's. *La Bamba*, 75 F.4th at 610; *see also Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 881 (5th Cir. 2019) ("The 'palming off' factor applies when a Lanham Act defendant attempts to pass off its goods as the plaintiff's."). Palming off typically involves "selling one's goods under the name of a competitor." *B&P Littleford, LLC v. Prescott Machine, LLC*, 530 F. Supp. 3d 729, 741 (E.D. Mich. 2021). As discussed above, Mansfield removed all CHOICE® marks other than the Highway Sign. It removed Choice branding from all rooms, the lobby, breakfast area, and the parking lot. Mansfield's attempts to disassociate itself from Choice indicate that it was not attempting to palm off its hotel services. *See Motor City Bagels, L.L.C. v. Am.*

*Bagel Co.*, 50 F. Supp. 2d 460, 488 (D. Md. 1999) ("The numerous changes imposed by the [franchisees] in their restaurants indicate that the [franchisees] were not attempting to 'palm off' [franchisor's] goods and services as their own."). At this stage, Choice has failed to establish that Mansfield diverted sales or palmed off its hotel services.

When considering the adequacy of other remedies, the Court notes that Mansfield has consented to a permanent injunction. The Sixth Circuit has stated that "'[i]njunctive relief is the remedy of choice for trademark and unfair competition cases….'" *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (quoting *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988)). Injunctive relief is particularly adequate where there is no evidence of diverted sales or palming off. Although Choice may ultimately prove it is entitled to additional monetary relief at trial, it simply has not established that a permanent injunction is inadequate at this stage of the litigation.

Even if the Court were inclined to grant Choice profits, there are genuine issues of material fact as to what those profits would be. Specifically, the parties dispute when Mansfield stopped its hotel operations. Choice claims Mansfield "ceased offering hotel services" on November 9, 2025. (Doc. 21-5, ¶ 6). Mansfield claims it closed the hotel a year earlier, in November 2024. (Doc. 24-1, ¶ 3). The one-year distinction matters. "[T]he Lanham Act only supports a claim against defendants who 'use' a protected mark 'in connection' with the offer or provision of 'goods or services.'" *Howard Johnston Int'l, Inc. v. Vraj Brig, LLC*, 2010 WL 215381, at *5 (D.N.J. Jan. 14, 2010) (quoting 15 U.S.C. § 1114(1)(a) and 15 U.S.C. 1125(a)(1)). Once Mansfield closed for business, the Highway Sign bearing Quality's mark was no longer being used in commerce, as required for Lanham Act liability. *See Days Inn Worldwide, Inc. v. Shri Ganesai LLC*, 791 F. Supp. 3d 540, 553 (D.N.J. 2025) ("[A] hotel sign sitting outside a burnt-out hotel is not being 'used,' let alone 'in commerce.' After

the hotel fire … there was no 'commerce' being done. No one was looking at the sign and deciding whether to check in, because the hotel was closed."). It is axiomatic that a closed business cannot be used in commerce. Because there is a genuine issue of material fact as to when Mansfield was closed for business, there is a corresponding dispute as to the amount of profit damages Choice would be entitled to under the Lanham Act. Factual disputes related to whether disgorgement of Mansfield's profits is equitable and what those profits are, preclude a finding that Choice is entitled to Mansfield's profits as a matter of law.

### 2. Choice's Actual Damages

The other form of monetary damages Choice seeks is actual damages in the form of a reasonable royalty. The Lanham Act permits recovery of "any damages sustained by the plaintiff[.]" 15 U.S.C. § 1117(a). In the case of trademark infringement involving a holdover franchisee, the franchisor may be awarded on the "royalties normally received by the franchisor…." *La Quinta Corp.*, 603 F.3d at 344. Some courts have even held that "recovery of lost royalties by a victim of trademark infringement is the *preferred* award of damages." *Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II,* LLC, 2017 WL 6945340, at *5 (S.D. Ala. Aug. 18, 2017) (emphasis added) (citing *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1519–20 (11th Cir. 1990)). Choice echoes this sentiment, claiming lost royalties "are the proper measure of Choice Hotel's damages." (Doc 26, at 8). But, just as with Choice's request for profits, there are genuine issues of material fact that preclude an award of lost royalties at the summary judgment stage.

Choice contends that it is entitled to royalties based on various fees outlined in the Franchise Agreement. Specifically, Choice believes it is entitled to 8.5% of Mansfield's preceding month's Gross Room Revenue. (Doc. 21, at 21). But the Franchise Agreement does not provide for an 8.5%

royalty fee, the royalty fee is 4.65%. (*See* Doc. 1-1, at 3). Presumably, Choice arrived at 8.5% by adding the 4.65% royalty fee with a 3.85% system fee which, according to the Franchise Agreement, is "for the ongoing development, maintenance, maintenance and upgrading of the Property Management System and Reservation System…." (*Id.*). However, there is no evidence that Mansfield used Choice's Property Management and Reservation System after the franchise relationship was terminated. In fact, there is evidence to suggest that Mansfield did not use these services. (*See* Doc. 1-5 ("[T]he hotel listing related to the Franchise Agreement was removed immediately after the Termination Date from choicehotels.com … [and] access to choiceAdvantage and the data retrievable thereby will be cut off 45 days from the Termination Date.")). Thus, as a sister court has acknowledged under analogous facts, "[i]t is not clear on the basis of summary judgment briefing and record whether the 'system fee' should be included as party of the royalty rate," because it is unclear whether Mansfield used the property management and reservation system after the Franchise Agreement was terminated; thus, awarding such a fee "may provide a windfall to Choice…." *Goldman Hosp.*, 2014 WL 642731, at *13.

There is also a factual issue related to Choice's proposed royalty methodology. Under the Franchise Agreement, the royalty fee is calculated based on a percentage of Mansfield's monthly gross room revenues. Choice concedes that it "does not know, and as a direct result of Mansfield's refusal to participate in this case, has no way of knowing, what the Gross Room Revenues were for the term of the holdover." (Doc. 21, at 21). While the Court acknowledges that Mansfield's gross revenues would be difficult to prove without conducting discovery, Choice apparently decided not to

pursue the discovery issue.[4] As already noted, Choice cannot rely entirely on Defendants' failure to respond to discovery as an excuse for its failure to develop an evidentiary record.

Without specific evidence of Mansfield's revenue, Choice has put forth what it believes is a "reasonable estimate of what [Mansfield] should have paid" as a royalty using historic revenue data. (*Id.*). In support of its "estimation" of Mansfield's profits, Choice submitted the Declaration of Assistant General Counsel Stuart M. Kreindler, Esq. (Doc. 21-5). He "supervise[s] a team of Choice Hotel employees" who review Choice's corporate records to ensure that franchisees meet their obligations under their respective franchise agreements. (*Id.* ¶ 1). Mr. Kreindler reiterates that Choice "does not know … [and] has no way of knowing what the gross room revenues were for the term of the holdover." (*Id.* ¶ 14). Nevertheless, Mr. Kreindler avers that Mansfield stopped offering hotel services effective November 9, 2025[5]—18 months after termination of the Franchise Agreement. (*Id.* ¶¶ 6–7). He further asserts that Mansfield stopped reporting revenue to Choice in February 2024 but the total gross-room revenue from February 2023 through January 2024 was $514,381.96—or an average gross room revenue of $42,865.16 per month. (*Id.* ¶¶ 9–11). Choice attempts to arrive at a "reasonable estimate" of the royalty Mansfield should have paid by multiplying the $42,865.16 gross room revenue by 8.5% yielding a monthly fee of $3,643.54. (*Id.* ¶ 18). Mr. Kreindler then multiplies the $3,643.54 fee by the 18 months Mansfield is alleged to have held over for a total of $65,583.72.

---

[4] As noted above, Choice did not pursue any available options to remedy Defendants' discovery deficiencies. The Court was unaware of the discovery issue until the filing of Choice's Motion for Summary Judgment. Before the close of fact discovery, Choice filed a status report stating that Choice issued discovery but "Defendant's [sic] responses have not been received." (Doc. 20). No further discovery issues were presented to the Court.

[5] Despite claiming he has "personal knowledge of the facts" in his declaration, it is unclear how Mr. Kreindler has personal knowledge of when Mansfield stopped offering hotel services in November 2025—a year after Manfield claims it stopped operating the hotel. (*See* Doc. 21-5).

(*Id.* at ¶ 19). Even if Mr. Kreindler's calculations are correct—which the Court does not assume because it is unclear whether the 3.85% system fee should be included—there is a genuine issue of fact as to the length of the holdover period. At this stage the Court cannot conclude as a matter of law whether a royalty fee would be equitable.

Next, Choice asks this Court to treble its damages because awarding Choice its actual damages does not provide an adequate "deterrent component." (Doc. 21, at 21). While that may be true, "the Lanham Act expressly prohibits levying damages that may be classified as a 'penalty.'" *La Quinta Corp.*, 603 F.3d at 342 (citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991)). The Lanham Act permits a damages award "above the amount found as actual damages not exceeding three times such amount[,]" but damages enhancements, if any, must remain equitable based on the circumstances of the case. 15 U.S.C § 1117(a). Damages enhancements, consistent with equity principles, are intended to "'provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice[.]'" *Id.* at 343 (quoting *Taco Cabana Int'l Inc.*, 932 F.2d at 1127). Without evidence of Choice's damages, the Court cannot say, at this stage, whether an enhancement would be equitable.

In a case with analogous (but more egregious) facts, the District Court for the Southern District of Alabama declined to treble Choice's damages because Choice made "no showing that it suffered actual harm as a result of Defendants' holdover infringement." *Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II,* LLC, 2017 WL 6945340, at *6 (S.D. Ala. Aug. 18, 2017). So too here, the only damage that might exist relates to an unsubstantiated FBI raid and assault which could conceivably result in a loss of goodwill and business reputation. "But a loss of good will and business

reputation do not justify trebling damages." *Id.* And even if it did, Choice has brought forth no admissible evidence related to the alleged raid and assault at the Mansfield hotel.

What is more, the scope and extent of Mansfield's infringement remain factual issues. The parties dispute when the hotel closed for business. The extent of Mansfield's infringement would weigh on the equity of a potential damages enhancement, and that critical fact is disputed. *See La Quinta Corp.*, 603 F.3d at 343 (holding that courts should consider a wide range of factors before making a damages enhancement).

**3. Choice's Litigation Costs**

The Lanham Act permits the prevailing party to recover its costs. As against Mansfield, Choice is the prevailing party. Choice now seeks $631.09 in costs, consisting of a $525.00 filing fee and $106.09 service of process fee. However, Choice did not submit any record evidence to substantiate the costs it seeks. The Court can take judicial notice of its own docket showing that Choice paid the $405.00 filing fee. *See* Fed. Rule Evid. 201. But it is unclear why Choice seeks $525 in filing fees. There is nothing on the docket to substantiate Choice's requested $106.09 service of process fee and Choice has provided no such evidence. Choice has not provided adequate evidence to support its request for costs as a matter of law.

**4. Attorneys' Fees**

Choice also requests that this Court award attorneys' fees related to maintaining this action. The Lanham Act permits an award of attorneys' fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). Under the Lanham Act, an exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 235 (6th Cir. 2019) (citing *Octane*

*Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). Whether a case is "exceptional" is determined on a case-by-case basis considering all relevant circumstances. *Id.*

Choice contends that this is an exceptional case because Choice "continued to use the QUALITY® Family of Marks in connection with the provision of hotel services for 18 months after termination of its Franchise Agreement." (Doc. 21, at 23). While such conduct constitutes trademark infringement, "[i]t does not … follow that a case will always be 'exceptional' for purposes of awarding attorney fees where the relevant conduct is found to be willful, fraudulent, and deliberate." *U.S. Structures*, 130 F.3d at 1193. Choice does not provide any support for the proposition that a holdover franchisee's continued use of a sign is, by itself, an exceptional case.

On the other hand, Mansfield contends this is not an exceptional case because it made a "good-faith effort … to create elements of dissimilarity by removing all the other signs and Marks," other than the Highway Sign. (Doc. 24, at 12; *see also* Doc. 24-1 ¶ 6). While Mansfield's continued use of the Highway Sign "is not ideal behavior, it is certainly not out of the ordinary and does not put this case outside the mine run of cases and render it exceptional." *Choice Hotels Int'l Inc. v. Baba Nanak Hosp. Grp. Corp.*, 2026 WL 1556577, at *5 (E.D. Wis. June 2, 2026). The present record does not support a finding that this is an exceptional case, which is a prerequisite to an award of attorneys' fees.

**CONCLUSION**

For the reasons outlined herein, the Motion for Summary Judgment is GRANTED as to Mansfield's liability on its claims for trademark infringement under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. § 1125(a), violation of the Ohio Deceptive Trade Practices Act, and common law trademark infringement and unfair competition under Ohio law, but is DENIED as to the claims against the Individual Defendants and as to remedies.

IT IS SO ORDERED.

PATRICIA A. GAUGHAN
United States District Judge

Date: 11/23/2026